## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

|  |  |
|---|---|
| JOSHUA STEFFENS, Derivatively on Behalf of Nominal Defendant INNOVATIVE INDUSTRIAL PROPERTIES, INC., St. Augustine, FL 32086 (St. Johns County) | Case No. _____ |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| ALAN D. GOLD c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |
| PAUL E. SMITHERS c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |
| DAVID SMITH c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |
| BEN REGIN c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |
| GARY KREITZER c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |
| GARY STECHER c/o Innovative Industrial Properties, Inc. 1389 Center Drive, Suite 200 Park City, UT 84098 | |

*[Caption continued on following page]*

SCOTT SHOEMAKER
c/o Innovative Industrial Properties, Inc.
1389 Center Drive, Suite 200
Park City, UT 84098

MARY ALLIS CURRAN
c/o Innovative Industrial Properties, Inc.
1389 Center Drive, Suite 200
Park City, UT 84098

                    Defendants,

-and-

INNOVATIVE INDUSTRIAL PROPERTIES,
INC.
1389 Center Drive, Suite 200
Park City, UT 84098

                    Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Josh Steffens ("Plaintiff"), by and through his undersigned attorneys, brings this

derivative complaint for the benefit of nominal defendant Innovative Industrial Properties, Inc.

("IIP" or the "Company"), against its Board of Directors (the "Board") and certain of its

executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties

and violations of federal law. Plaintiff alleges the following based upon personal knowledge as

to himself and his own acts, and information and belief as to all other matters, based upon, *inter*

*alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among

other things, a review of Defendants' publicly available documents, conference call transcripts

and announcements made by Defendants, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding IIP, legal filings, news reports,

securities analysts' reports about the Company, the securities class action captioned *Giraudon v. Innovative Industrial Properties, Inc. et al.*, 1:25-cv-00182-RDB (D. Md.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of IIP against certain of its officers and members of the Company's Board of Directors (the "Individual Defendants")[1] for breaches of their fiduciary duties from at least February 27, 2024 through December 19, 2024 (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.     Incorporated in 2016, IIP is a real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to state-licensed operators for their regulated medical-use cannabis facilities.

3.     The Company conducts its business through a traditional umbrella partnership REIT, also known as "UPREIT," structure, in which its properties are owned by IIP Operating Partnership, LP (the "Operating Partnership"), of which IIP is the sole general partner and owner of 100% of the limited partnership interests.

4.     As of September 30, 2024, the Company owned 108 properties across 19 states, comprising an aggregate of approximately 9 million rentable square feet.

5.     As a REIT, IIP's primary source of income is derived from rental revenue generated by the properties that it acquires. To measure its financial performance, IIP uses funds from

---

[1] The Individual Defendants are Alan D. Gold ("Gold"), Paul E. Smithers ("Smithers"), David Smith ("Smith"), Ben Regin ("Regin"), Gary Kreitzer ("Kreitzer"), David Stecher ("Stecher"), Scott Shoemaker ("Shoemaker"), and Mary Allis Curran ("Curran"). "Defendants" means IIP and the Individual Defendants.

operations ("FFO"), which is the most commonly accepted and reported non-GAAP measure of a REIT's operating performance equal to net income. FFO is calculated by adding depreciation, amortization, and losses on sales of property to earnings and then subtracting any gains on sales of property and any interest income. The Company has stated that "management believes FFO and FFO per share to be supplemental measures of a REIT's performance because they provide an understanding of the operating performance of our properties without giving effect to certain significant non-cash items, primarily depreciation expense."

6.      In its earnings releases and quarterly financial reports, the Company reports "Normalized FFO," which is calculated by adjusting FFO to exclude certain GAAP income and expense amounts that the Company believes are infrequent and unusual in nature and/or not related to its core real estate operations, and adjusted FFO ("AFFO"), which is calculated by adjusting Normalized FFO for certain cash and non-cash items.

7.      Throughout the Relevant Period, the Individual Defendants made materially false and misleading positive statements regarding the Company's financial and operational results, namely about the Company's structure, real estate portfolio, tenants, and financial performance.

8.      The truth began to emerge on November 6, 2024, when the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release reported Normalized FFO per share of $2.02 for the quarter, missing the consensus estimate of $2.03 per share, and constituting a decline from Normalized FFO per share of $2.09 in the same quarter of 2023. The 3Q24 Earnings Release also reported total revenue of $76.5 million for the quarter, missing the consensus estimate of $77.5 million, and constituting a decline of 1.7% from the $77.8 million of revenue for the same period in 2023. The Company attributed the decrease in revenue to the following:

(i) a $3.0 million decline in contractual rent and property management fees received during the three months ended September 30, 2024 related to properties that IIP regained possession of since June 2023; (ii) a decline of $1.3 million due to rent received but not recognized in rental revenues resulting from the re-classifications of two sales-type leases starting January 1, 2024; and (iii) $1.3 million of contractually due rent and property management fees that were not collected during the three months ended September 30, 2024.

9.      On this news, the Company's stock price fell $12.93 per share, or approximately 10.5%, to close at $110.07 per share on November 7, 2024.

10.      Then, on December 20, 2024, the truth fully emerged when IIP issued a press release announcing that, on December 19, 2024, PharmaCann Inc. ("PharmaCann"), the tenant of eleven of IIP's properties—the rent of which accounted for 17% of the Company's total rental revenues for the three and nine months ended September 30, 2024—defaulted on its obligations to pay rent for the month of December under six of its eleven leases (the "Leases"). The Company reported that the loss in rent for these six properties totaled $4.2 million. In this press release, IIP also announced that it applied security deposits held by IIP pursuant to these Leases for the payment in full of the defaulted rent, in addition to late penalties and interest. Lastly, the Company revealed that, although PharmaCann paid rent in full on its remaining five Leases for the month of December, that PharmaCann was in default under the five Leases due to its non-payment of rent on the other six Leases.

11.      On this news, the Company's stock price fell $21.68 per share, or approximately 22.7%, to close at $73.66 per share on December 20, 2024.

12.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (a) IIP was experiencing significant declines in rent

payments and property management fees in connection with certain customer leases; (b) the decline in rent payments and property management fees would likely impair the Company's ability to maintain FFO and revenue growth; (c) as a result, IIP's leasing operations were less profitable than the Company represented to investors; (d) the Board and management were not properly overseeing risks to the Company, namely risks related to rent payments; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

13.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Gold, Smithers, Smith, and Regin on January 17, 2025, in the United States District Court for the District of Maryland.

14.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

15.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of IIP's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because IIP is incorporated in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

22.     Plaintiff is, and has been at all relevant times, a continuous shareholder of IIP.

*Nominal Defendant*

23.     Nominal Defendant IIP is a Maryland corporation with its principal executive offices located at 1389 Center Drive, Suite 200, Park City, Utah 84098.  IIP's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IIPR."

*Individual Defendants*

24.     Defendant Gold is a co-founder of the Company and has served as Executive Chairman of the Board since 2016.

25.     Defendant Smithers is a co-founder of the Company and has served as Chief Executive Officer ("CEO") and President of the Company since June 2016. Smithers has served as a director of the Company since November 2016.

26.     Defendant Smith has served as Chief Financial Officer and treasurer of the Company since March 2023.

27.     Defendant Regin has served as Chief Investment Officer of the Company since March 2023.

28.     Defendant Kreitzer is a co-founder of the Company and has served as Vice Chairman of the Board since June 2016. Kreitzer also serves as Chair of the Board's Compensation Committee and as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee.

29.     Defendant Stecher has served as a director of the Company since November 2016. Stecher also serves as Chair of the Board's Audit Committee and as a member of the Board's Compensation Committee.

30.    Defendant Shoemaker has served as a director of the Company since November 2016. Shoemaker also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation Committee.

31.    Defendant Curran has served as a director of the Company since December 2019. Curran also serves as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.    By reason of their positions as officers and/or directors of IIP, and because of their ability to control the business and corporate affairs of IIP, the Individual Defendants owed IIP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage IIP in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of IIP and its shareholders.

33.    Each director and officer of the Company owes to IIP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of IIP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.    To discharge their duties, the officers and directors of IIP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of IIP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38.    To discharge their duties, the officers and directors of IIP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of IIP were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Maryland and the United States, and pursuant to IIP's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how IIP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of IIP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that IIP's operations would comply with all applicable laws and IIP's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39.     Each of the Individual Defendants further owed to IIP and the shareholders the duty of loyalty requiring that each favor IIP's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40.     At all times relevant hereto, the Individual Defendants were the agents of each other and of IIP and were at all times acting within the course and scope of such agency.

41.     Because of their advisory, executive, managerial, and directorial positions with IIP, each of the Individual Defendants had access to adverse, non-public information about the Company.

42.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by IIP.

## IIP'S CODE OF CONDUCT

43.     The Company's Code of Conduct begins with a letter from Defendant Smithers, which states, in relevant part:

> Innovative Industrial Properties, Inc. (including IIP Operating Partnership, LP and their respective subsidiaries, the "Company") is dedicated to conducting its business consistent with the highest standards of business ethics. We have an obligation to our employees, stockholders, tenants, contractors, real estate brokers/agents, partners, lenders, community representatives and other business contacts to be honest, fair and forthright in all of our business activities.

44.     The Code of Conduct applies to all of IIP's directors, officers, and employees.

45.     Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

**Identifying Potential Conflicts of Interest**

A conflict of interest can occur when the private interest of an employee or his or her family member interferes, or reasonably appears to interfere, with the interests of the Company as a whole. You should avoid any private interest that influences your ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively. . . .

You should not discuss the Company's confidential information with members of your family who have such conflicting interests. . . .

**Disclosure of Conflicts of Interest**

The Company requires that employees disclose any situations that reasonably would be expected to give rise to a conflict of interest. If you suspect that you have a conflict of interest, or something that others could reasonably perceive as a conflict of interest, you must report it to your supervisor or the General Counsel. Your supervisor and the General Counsel will work with you to determine whether you have a conflict of interest and, if so, how best to address it. Although conflicts of interest are not automatically prohibited, they are not desirable and may only be waived as described in "Waivers of the Code" above. Conflicts of interest of our directors, executive officers or other principal financial officers may only be waived by our Board of Directors or the appropriate committee of our Board of Directors and will be promptly disclosed to the public to the extent required by law or the rules of the New York Stock Exchange.

46.    Under the section titled "Company Records," the Code of Conduct states:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and other disclosures to the public and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy. Ask your supervisor if you have any questions.

47.    Under a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

As a public company, we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Accounting Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

48.     In a section titled "Compliance with Laws and Regulations," the Code of Conduct states, in relevant part, "Each employee has an obligation to comply with all laws, rules and regulations applicable to the Company."

49.     In a section titled "Compliance with Insider Trading Laws," the Code of Conduct states, in relevant part:

Company employees are prohibited from trading in the stock or other securities of the Company or any other company while in possession of material, nonpublic information about the Company or the other company. In addition, Company employees are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell stock or other securities of the Company or any other company on the basis of material, nonpublic information. Company employees who obtain material nonpublic information about another company in the course of their employment are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade based on such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including termination of employment.

Information is "non-public" if it has not been made generally available to the public by means of a press release or other means of widespread distribution. Information is "material" if a reasonable investor would consider it important in a decision to buy, hold or sell stock or other securities. As a rule of thumb, any information that would affect the value of stock or other securities should be considered material.

50.     Under a subsection titled, "Compliance with Regulation FD," the Code of Conduct states, in relevant part:

14

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material, non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

To ensure compliance with Regulation FD, we have designated the following officials as "Company Spokespersons:"

- Alan Gold, Executive Chairman

- Paul Smithers, President and Chief Executive Officer

- Catherine Hastings, Chief Financial Officer, Chief Accounting Officer and Treasurer

Only Company Spokespersons are authorized to disclose information about the Company in response to requests from securities market professionals or stockholders. If you receive a request for information from any securities market professionals or stockholders, promptly contact the Chief Financial Officer to coordinate a response to such request.

Company employees who regularly interact with securities market professionals are specifically covered by Regulation FD and have a special responsibility to understand and comply with Regulation FD. Contact the General Counsel if you have any questions about the scope or application of Regulation FD.

### **IIP'S AUDIT COMMITTEE CHARTER**

51.      IIP's Audit Committee Charter states that the purpose of the Audit Committee is

to:

[A]ssist the Board with its oversight responsibilities regarding: (i) the integrity of the Company's financial statements and internal controls over financial reporting; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditor; and (v) the Company's risk management programs. The Committee shall prepare the report required by the rules of the U.S. Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

52.      The Audit Committee Charter also states that "[m]anagement of the Company is

responsible for the preparation, presentation and integrity of the Company's financial statements as well as the Company's financial reporting process, accounting policies, internal audit function, internal control over financial reporting and disclosure controls and procedures."

53.    In a section titled "Powers and Responsibilities," the Audit Committee Charter states that the Audit Committee has the following duties and responsibilities, among others:

*Interaction with the Independent Registered Public Accounting Firm*

1.    *Appointment and Oversight.* The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of the independent registered public accounting firm (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attestation services for the Company, and the independent registered public accounting firm shall report directly to the Committee. . . .

*Annual Financial Statements and Annual Audit*

4.    *Meetings with Management, the Independent Registered Public Accounting Firm and the Internal Auditor.*

(i)    The Committee shall meet with management, the independent registered public accounting firm and the internal auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

(ii)    The Committee shall review and discuss with management and the independent registered public accounting firm: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies (including a discussion of management's process for assessing the effectiveness of internal controls under Section 404 of the Sarbanes-Oxley Act of 2002); (B) any analyses prepared by management or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the

Company's financial statements.

(iii)    The Committee shall review and discuss the annual audited financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.    *Separate Meetings with the Independent Registered Public Accounting Firm.*

(i)    The Committee shall review with the independent registered public accounting firm any problems or difficulties the independent registered public accounting firm may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the independent registered public accounting firm are: (A) any accounting adjustments that were noted or proposed by the independent registered public accounting firm but were "passed" (as immaterial or otherwise); (B) any communications between the audit team and the independent registered public accounting firm's national office respecting auditing or accounting issues presented by the engagement; and (C) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company. The Committee shall obtain from the independent registered public accounting firm assurances that Section 10A(b) of the Exchange Act has not been implicated.

(ii)    The Committee shall discuss with the independent registered public accounting firm the report that such auditor is required to make to the Committee regarding: (A) all accounting policies and practices to be used that the independent registered public accounting firm identifies as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent registered public accounting firm, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (C) all other material written communications between the independent registered public accounting firm and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent registered public accounting firm's engagement letter, independent registered public accounting firm's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

(iii)    The Committee shall discuss with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16 (Communications with Audit Committees) or any successor as then in effect.

6.    *Recommendation to Include Financial Statements in Annual Report*. The Committee shall, based on the review and discussions in paragraphs 4(iii) and 5(iii) above, and based on the disclosures received from the independent registered public accounting firm regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(ii) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

*Quarterly Financial Statements*

7.    *Meetings with Management and the Independent Registered Public Accounting Firm*. The Committee shall review and discuss the quarterly financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Internal Audit*

8.    *Appointment*. The Committee shall review the appointment and replacement, and participate and provide input into the employment reviews, of the internal auditor.

9.    *Separate Meetings with the Internal Auditor*. The Committee shall meet periodically with the Company's internal auditor to discuss the responsibilities, budget and staffing of the Company's internal audit function and any issues that the internal auditor believes warrant audit committee attention, including review of the internal auditor's assessments of the Company's risk management processes and system of internal control. The Committee shall discuss with the internal auditor any significant reports to management prepared by the internal auditor and any responses from management.

*Other Powers and Responsibilities*

10.    The Committee shall discuss with management and the independent registered public accounting firm the Company's earnings press releases. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

18

11.    The Committee shall discuss with management and the independent registered public accounting firm the Company's compliance with the applicable regulatory provisions required to maintain the Company's status as a Real Estate Investment Trust.

12.    The Committee shall conduct a reasonable prior review of all related party transactions (meaning transactions required to be disclosed pursuant to Item 404 of Regulation SK) and shall review such transactions on an ongoing basis. Any such transaction determined by the Committee to be inconsistent with the interests of the Company and its stockholders will not be approved.

13.    The Committee shall discuss with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

14.    The Committee shall discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

15.    The Committee shall request assurances from management, the independent registered public accounting firm and the Company's internal auditors that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of affiliated party transactions.

16.    The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management, including, without limitation, the Company's significant operational, regulatory and financial risk exposures, including risks associated with financial accounting and audits and internal control over financial reporting, and the actions management has taken to limit, monitor or control such exposures.

17.    The Committee shall discuss with management the Company's policies and procedures with respect to data privacy and technology security and control.

18.    The Committee shall set clear hiring policies for employees or former employees of the Company's independent registered public accounting firm.

19.    The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also establish procedures for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters.

20.    The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in the Company's annual proxy statement or Annual Report on Form 10-K.

21.    The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent registered public accounting firm, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

22.    The Committee shall at least annually perform an evaluation of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

23.    The Committee shall at least annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

24.    The Committee shall discuss any disclosures made to the Committee by the Company's Chief Executive Officer or Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q regarding: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any material weaknesses in internal controls identified to the independent auditor; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

25.    The Committee shall read management's report (to be included in the Company's Annual Report on Form 10-K) assessing the effectiveness of the internal control structure and procedures of the Company for financial reporting and shall discuss with the independent registered public accounting firm such auditor's attestation to and report on the effectiveness of internal control over financial reporting.

## SUBSTANTIVE ALLEGATIONS

### Background

54.    Incorporated in 2016, IIP is a REIT focused on the acquisition, ownership, and management of specialized industrial properties leased to state-licensed operators for their regulated medical-use cannabis facilities.

55.    The Company conducts its business through a traditional UPREIT structure, in which its properties are owned by the Operating Partnership, of which IIP is the sole general

partner and owner of 100% of the limited partnership interests.

56.    As of September 30, 2024, the Company owned 108 properties across 19 states, comprising an aggregate of approximately 9 million rentable square feet.

57.    As a REIT, IIP's primary source of income is derived from rental revenue generated by the properties that it acquires. To measure its financial performance, IIP uses FFO, which is the most commonly accepted and reported non-GAAP measure of a REIT's operating performance equal to net income. FFO is calculated by adding depreciation, amortization, and losses on sales of property to earnings and then subtracting any gains on sales of property and any interest income. The Company has stated that "management believes FFO and FFO per share to be supplemental measures of a REIT's performance because they provide an understanding of the operating performance of our properties without giving effect to certain significant non-cash items, primarily depreciation expense.

58.    In its earnings releases and quarterly financial reports, the Company reports its financial results through Normalized FFO and AFFO.

***Individual Defendants' Materially False and Misleading Statements***

59.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading positive statements regarding the Company's financial and operational results, namely about the Company's structure, rental portfolio, tenants, and financial performance.

60.    On February 27, 2024, the Company filed its annual report for 2023 on a Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K highlighted the Company's rental structure and financial prospects, stating, in relevant part:

- ***Recurring Revenue with Contractual Escalations***. As of December 31, 2023, we owned 108 properties. Of these 108 properties, we include 103 properties in our operating portfolio, which were 95.8% leased as of December 31, 2023, with a weighted-average remaining lease term of

approximately 14.6 years, and which are subject to contractual rental rate increases. Along with our existing portfolio, we expect to continue to enter into additional similar transactions structured to provide recurring revenue with contractual escalations.

- *Demonstrated Investment Acumen*. We utilize rigorous underwriting standards for evaluating acquisitions and potential tenants to ensure that they meet our strategic and financial criteria. Our extensive experience and relationships in the real estate and regulated cannabis industry enable us to identify, negotiate and close on acquisitions and leases with established operators and other operators which meet our criteria.

- *Regulated Cannabis Industry Growth Trends*. Based on the strong historical and projected growth for the regulated cannabis industry, we expect to see significant spending by state-licensed cannabis operators on their existing and new state-licensed cannabis facilities, presenting an opportunity for us to be a key capital provider in their expansion initiatives.

61.     The 2023 10-K went on to highlight the Company's rental portfolio, stating, in relevant part:

Our principal business objective is to maximize stockholder returns through a combination of (1) distributions to our stockholders, and (2) sustainable long-term growth in cash flows from increased rents, which we hope to pass on to stockholders in the form of increased distributions. Our primary strategy to achieve our business objective is to acquire and own a portfolio of specialized industrial properties, including regulated cannabis facilities leased to tenants holding the requisite state licenses to operate in the regulated cannabis industry. This strategy includes the following components:

- *Owning Specialized Industrial Properties and Related Real Estate Assets for Income.* We primarily acquire regulated cannabis facilities from licensed operators who will continue their cultivation, processing and/or dispensing operations after our acquisition of the property. We expect to hold acquired properties for investment, with the goal of generating stable and increasing rental income from leasing these properties to licensed operators.

- *Expanding as Additional States Enact Regulated Cannabis Programs.* We acquire properties in the United States, with a focus on states that have established regulated cannabis programs. As of December 31, 2023, we owned properties in 19 states, and we expect that our acquisition opportunities will continue to expand as additional states establish regulated cannabis programs and license new operators.

- ***Providing Expansion Capital to Existing Tenants as an Additional Source of Income***. We have provided expansion capital for many of our existing tenant operators as they expand operations in additional states and locations within a state, as well as capital for continued enhancements of production capacity at existing facilities that these operators lease from us, which correspond to adjustments in rent under the applicable leases and other provisions in certain cases. We expect to continue to focus on executing on these expansion initiatives with our tenant operators.

- ***Preserving Financial Flexibility on our Balance Sheet.*** We are focused on maintaining a flexible capital structure for financing our growth initiatives. As of December 31, 2023, we had debt comprised of approximately $4.4 million principal amount of Exchangeable Senior Notes and $300.0 million principal amount of our 5.50% Senior Notes due 2026 (the "Notes due 2026"), representing a total quarterly fixed cash interest obligation of approximately $4.1 million and approximately 12% of our total gross assets of approximately $2.6 billion, with no debt maturing until May 2026 (holders exchanged the remaining principal amount of the Exchangeable Senior Notes for a combination of shares of common stock and cash subsequent to year-end).

62.     Additionally, the 2023 10-K, in a section titled "Access to Capital," assured

investors that the Company's business model would sustain its success:

> To date, the status of state-licensed cannabis under federal law has limited the ability of state-licensed industry participants to fully access the U.S. banking system and traditional financing sources. These limitations, when combined with the high costs of maintaining licensed and stringently regulated cannabis facilities, substantially increase the cost of production. While future changes in federal and state laws may ultimately open up financing options that have not been widely available to date in this industry, ***we believe that our sale-leaseback and other real estate solutions to state-licensed industry participants will continue to be attractive capital options for regulated operators.***

(Emphasis added).

63.     The 2023 10-K also included a statement that assured investors that the Company's

portfolio was diversified enough to manage potential risks, stating, in relevant part:

**Risk Management**

As of December 31, 2023, we owned 108 properties located in 19 states. Many of our tenants are tenants at multiple properties. ***We will continue to attempt to diversify the investment size and location of our portfolio of properties in order***

*to manage our portfolio-level risk*. Over the long term, we expect that no single property will exceed 20% of our total assets and that properties leased to a single tenant (individually or together with its affiliates) will not exceed 20% of our total assets. Notwithstanding the foregoing, the industry continues to experience significant consolidation among regulated cannabis operators, and certain of our tenant operators may combine, increasing the concentration of our tenant portfolio with those consolidated operators.

64.    The 2023 10-K was signed by Defendants Gold, Kreitzer, Curran, Smithers, Smith, Shoemaker, and Stecher.

65.    The 2023 10-K was also accompanied by certifications made by Defendants Smithers and Smith pursuant to Exchange Act Rules 13a-15(e) and 15d-15(e) and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Smithers and Smith attested to the accuracy of the 2023 10-K.

66.    On the same day, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2023 (the "4Q23 Earnings Release"). In the 4Q23 Earnings Release, the Company reported Normalized FFO of $2.07 per share for the fourth quarter. The Company also reported total revenue of $309.5 million for the full year, and total revenue of $79.2 million for the fourth quarter.

67.    Also on February 26, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2023 (the "Q423 Earnings Call"). During the Q423 Earnings Call, Defendant Gold touted the Company's portfolio, stating, in relevant part, "[w]e have one of the strongest and most experienced teams of real estate professionals in the cannabis industry, a high-quality portfolio and a conservative and flexible balance sheet with a 12% debt to total gross assets. No variable rate debt, no debt maturities until May 2026."

68.    Also during the Q423 Earnings Call, Defendant Smithers highlighted the strength

of the Company's tenants, stating, in relevant part, "[a]s we have noted in the past, and I think it is worth repeating here, we are of course first and foremost focused on maximizing the value of each of our properties and having tenants with strong teams that can manage their businesses successfully through the inevitable ups and downs with the industry."

69.    Defendant Regin also made positive statements regarding the Company's business, including its business with PharmaCann, during the Q423 Earnings Call, stating, in relevant part:

> Regarding new investment activity, we have continued to selectively close on new opportunities, supporting our tenant partners and their growth initiatives in key markets. . . .
>
> We also executed a lease amendment with PharmaCann to provide additional construction funding of $16 million for our New York asset as PharmaCann executes on its strategy to expand production capacity after being awarded an adult-use production license late last year.
>
> **We are pleased with the demand we are seeing for our assets across markets and the significant leasing progress we have made in the last year, while also continuing to source attractive new investment opportunities, which we will continue to pursue on a very selective, disciplined basis.**

(Emphasis added).

70.    During the questions and answers section of the Q423 Earnings Call, in response to a question regarding PharmaCann and IIP's other New York tenants, Defendant Regin stated, in relevant part:

> I think we're seeing -- we're happy to see the additional retail licenses being issued. There's certainly been some historical challenges, but we very much like the position that our tenant partners are in the state.
>
> **To your comment about PharmaCann, we do there's a tremendous amount of value in that asset in particular**. A lot of the cultivation in the state is either outdoor greenhouse. As Paul touched on, that is one of the very few high-quality indoor facilities in the state. **I think it sets PharmaCann up very well to take advantage of the wholesale opportunities that we're going to see**.
>
> It's projected to be one of the top markets in the country, perhaps not growing as fast as some had hoped in previous years, but we're really seeing some

improvement, seeing the improved sentiment from the [multi-state operators], as you mentioned, people that are very bullish on the state want to get into the market. They recognize the potential there and we're very happy to support our tenant partners on their growth initiatives in that state.

(Emphasis added).

71.     On April 1, 2024, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy stated that the Board and its committees played an "active role" in overseeing risk management, stating, in relevant part:

Our Board plays an active role in overseeing the management of our risks. The committees of our Board assist our full Board in risk oversight by addressing specific matters within the purview of each committee. The audit committee focuses on oversight of financial risks and cyber security; the compensation committee focuses primarily on risks relating to executive compensation plans and arrangements; and the nominating and corporate governance committee focuses on reputational and corporate governance risks, including the independence of our Board. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our full Board keeps itself regularly informed regarding such risks, including through committee reports.

72.     The 2024 Proxy incorporated the "Risk Factors" section of the 2023 10-K, which identified the following as risks to the Company, among others:

Risks Related to Our Business

- Many of our tenants are, and we expect that many of our future tenants will be, companies with limited histories of operations and may be unable to pay rent with funds from operations or at all.

- The inability of any single tenant to make its lease payments could adversely affect our business.

73.     Accordingly, the Board was responsible for overseeing risks related to the inability of the Company's tenants to pay rent, and the statements in 2024 Proxy related to the Company's role in risk oversight misleadingly assured investors that the Board was exercising proper oversight over these risks.

74.     On May 9, 2024, the Company issued a press release announcing its financial

results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, the Company reported Normalized FFO per share of $1.98 for the first quarter and total revenue of $75.5 million for the quarter. The 1Q24 also reported that the Company executed a lease amendment for one of PharmaCann's New York properties and that there was a $6 million increase to contractual rent and property management fees for the quarter, "which was primarily driven by contractual rent escalations and amendments to leases for additional improvement allowances at existing properties that resulted in adjustments to rent. . . ."

75.    On the same day, the Company held an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Gold touted the Company's financial growth for the quarter, stating, in relevant part:

> The first four months of 2024 have been very productive for our team with our focus on driving re-leasing activity and monitoring the completion of significant development projects at our properties, along with continued support of our tenants and funding critical infrastructure improvements to both further enhance production capacity and efficiency and activate significant projects under development. . . .
>
> The company notched another solid quarter in Q1, generating $2.21 in AFFO per share and further enhancing the company's liquidity position in the first four months of the year, with the upsizing of the revolving credit facility from $30 million to $50 million.
>
> While AFFO per share was down modestly quarter to quarter, we note that rents for the new leases we executed in late 2023 and year to date are not expected to commence for some months to come as new tenants need the time to obtain the requisite approvals to operate and transition into these properties in addition to certain pre-leased properties under development where construction needs to be completed. As we have reiterated in the past, we are really pleased with our capital position, especially in light of the macroeconomic environment impacting real estate companies and the cannabis industry as a general matter.

76.    During the 1Q24 Earnings Call, Defendant Regin highlighted the Company's leasing progress, stating, in relevant part:

For my prepared remarks, I plan to highlight our continued leasing progress for our vacant and underdevelopment assets. Year to date, we've made substantial progress on this front, executing four new leases covering $69 million of invested capital in California and Michigan. California, we've executed new leases for our 19th Avenue and McLane Street properties in Palm Springs with Gold Flora, an existing tenant of ours and a leading vertically integrated operator in California.

And in Michigan, as we noted last quarter, we executed an LOI for our Harvest Park facility prior to the move-out of the former tenant and, earlier this quarter, executed a lease with Lume Cannabis Company, one of the largest operators in the Michigan market. We also signed a lease in January for one of our three small retail vacancies in the state. We were very pleased with the demand we saw for these assets, the speed at which we executed new leases, and the relatively minimal amount of incremental capital required for re-tenanting. *We believe our ongoing execution on our leasing initiatives supports our underlying thesis regarding the high-quality, purpose- built, mission-critical nature of our real estate portfolio*. . . .

Regarding new investment activity, in the first four months of 2024, we executed three lease amendments to fund additional improvements at properties totaling $22.1 million, including $16 million for *PharmaCann in New York, where PharmaCann is focused on expanding production capacity after being awarded an adult-use production license late last year.*

(Emphasis added).

77.    On August 6, 2024, the Company hosted an earnings call for investors and analysts to discuss the Company's financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Gold stated, in relevant part:

Q2 was another solid quarter for IIP generating $80 million in total revenues and $2.29 in AFFO per share. That performance enabled us to sequentially increase our Q2 common stock dividend by 4.4% to $1.90, continuing our track record of increasing our dividend every year since our inception in 2016. We achieved these results without the full impact of the rents for new leases that we executed in late 2023 and year-to-date, in addition to certain pre-leased properties under development where construction needs to be completed. . . .

*As we have reiterated in the past, we are really pleased with our capital position,* especially in light of the macroeconomic environment impacting real estate companies in the cannabis industry.

Our total available liquidity exceeded $210 million as of quarter end, including another upsizing capacity under our revolving credit facility in Q2 to $50 million,

and fully funds any remaining development commitments we have, along with providing ample dry power for additional strategic investments.

(Emphasis added).

78.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) IIP was experiencing significant declines in rent payments and property management fees in connection with certain customer leases; (b) the decline in rent payments and property management fees would likely impair the Company's ability to maintain FFO and revenue growth; (c) as a result, IIP's leasing operations were less profitable than the Company had represented to investors; (d) the Board and management were not properly overseeing risks to the Company, namely risks related to rental payments; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

79.     The truth began to emerge on November 6, 2024, when the Company issued the 3Q24 Earnings Release to report its financial results for the fourth quarter of 2024 and revealed for the first time during the Relevant Period that FFO per share had decreased. The 3Q24 Earnings Release revealed that Normalized FFO per share was $2.02 for the quarter, a decrease from the $2.09 per share for the same quarter in 2023. The 3Q24 Earnings Release also reported that the Company had total revenue of $76.5 million for the quarter, which missed the consensus estimate of $77.5 million and constituted a decrease from the $77.8 million in revenue for the same quarter in 2023.

80.     The 3Q24 Earnings Release went on to state, in relevant part, that:

*For the three months ended September 30, 2024, IIP generated total revenues of $76.5 million, compared to $77.8 million for the same period in 2023, a decrease of 1.7%.* The decrease was primarily due to (i) a $3.0 million decline in contractual rent and property management fees received during the three months ended September 30, 2024 related to properties that IIP regained possession of since June 2023; (ii) a decline of $1.3 million due to rent received but not recognized in rental revenues resulting from the re-classifications of two sales-type leases starting January 1, 2024; and (iii) $1.3 million of contractually due rent and property management fees that were not collected during the three months ended September 30, 2024. This decline was partially offset by a $4.6 million increase to contractual rent and property management fees, which was primarily driven by contractual rent escalations, amendments to leases for additional improvement allowances at existing properties that resulted in adjustments to rent and new leases entered into since June 2023. . . .

For the three months ended September 30, 2024, IIP recorded net income attributable to common stockholders of $39.7 million, or $1.37 per share; funds from operations (FFO) of $57.6 million, or $2.02 per share; Normalized FFO of $57.8 million, or $2.02 per share; and AFFO of $64.3 million, or $2.25 per share.

(Emphasis added).

81.    On this news, the Company's stock price fell $12.93 per share, or approximately 10.5%, to close at $110.07 per share on November 7, 2024.

82.    Then, on December 20, 2024, the truth fully emerged when the Company issued a press release titled "Innovative Industrial Properties Reports Default by PharmaCann on All Leases," wherein it announced that one of the Company's tenants had defaulted on its obligations to pay rent at multiple properties. This press release stated, in relevant part:

Innovative Industrial Properties, Inc. (IIP), through indirect, wholly owned subsidiaries serving as landlords, previously entered into leases (collectively, the Leases) with PharmaCann Inc. and its affiliates (collectively, PharmaCann) as tenants for eleven properties that IIP owns, which represented 17% of IIP's total rental revenues for the three and nine months ended September 30, 2024.

On December 19, 2024, PharmaCann defaulted on its obligations to pay rent for the month of December under six of the eleven Leases, for properties located in Illinois, Massachusetts, Michigan, New York, Ohio and Pennsylvania. December rent, including base rent, property management fees and estimated tax and insurance payments, totaled $4.2 million for these six properties. IIP applied security deposits held by IIP pursuant to these Leases for the payment in full of the

defaulted rent, in addition to late penalties and interest.

Although PharmaCann paid rent in full under the remaining five Leases totaling $90,000 for the month of December, as a result of cross-default provisions contained in each of the Leases, on December 19, 2024, PharmaCann also defaulted on its obligations under these five Leases, as a result of the non-payment of rent on the other six Leases.

IIP is continuing discussions with PharmaCann regarding the Leases and expects to enforce its rights under the Leases aggressively, which may include, but is not limited to, commencing eviction proceedings as IIP deems necessary.

83.    On this news, the Company's stock price fell $21.68 per share, or approximately 22.7%, to close at $73.66 per share on December 20, 2024.

***Harm to the Company***

84.    As a direct and proximate result of the Individual Defendants' misconduct, IIP has lost and expended, and will lose and expend, millions of dollars.

85.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Gold, Smithers, Smith, and Regin, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

86.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

87.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

88.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

89.    Plaintiff will adequately and fairly represent the interests of IIP and its shareholders in enforcing and prosecuting its rights.

90.    IIP is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91.    Plaintiff is a current shareholder of IIP and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

92.    A pre-suit demand on the Board of IIP is futile and, therefore, excused.  At the time this action was commenced, the six-person Board consisted of Individual Defendants Gold, Smithers, Kreitzer, Stecher, Shoemaker, and Curran (the "Director Defendants").  As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

93.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

94.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

95.    Each of the Individual Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

96.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of IIP, the Director Defendants knew, or should have known, the material facts surrounding IIP's financial condition and internal control mechanisms.

97.    Defendant Gold is not disinterested or independent. Defendant Gold is a co-founder of the Company and serves as Executive Chairman of the Board.  Defendant Gold is also named as a defendant in the Securities Class Action, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, as stated in the 2024 Proxy, the Company admits that Defendant Gold is a non-independent director.

98.    Furthermore, Defendant Smithers is not disinterested or independent. Defendant Smithers is a co-founder of the Company and serves as CEO and President of the Company. Defendant Smithers is also named as a defendant in the Securities Class Action, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, as stated in the 2024 Proxy, the Company admits that Defendant Smithers is a non-independent director.

99.    Moreover, Director Defendants Gold, Kreitzer, Curran, Smithers, Shoemaker, and Stecher signed the 2023 10-K. Defendant Smithers also signed a SOX Certification that accompanied the 2023 10-K. Accordingly, these Director Defendants breached their fiduciary

duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

100.    Additionally, the Director Defendants are not independent or disinterested in light their longstanding business and personal relationships with each other. For instance, Defendants Gold, Kreitzer, and Smithers are all co-founders of the Company. Furthermore, Defendants Gold and Kreitzer are co-founders and former directors and executives of BioMed Realty Trust, Inc. and co-founders and former executives of Alexandria Real Estate Equities, Inc.

101.    Furthermore, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

102.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

103.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

104.    Defendants Stecher, Curran, and Kreitzer (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to

the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

105.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

106.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

109.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

110.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

111.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, which was filed with the SEC. As alleged above, the 2024 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to missed rental payments from the Company's tenants.

112.    The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain Director Defendants.

113.    The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Gold, Kreitzer, Curran, Shoemaker, Smithers, and Stecher to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

114.    The Company was damaged as a result of the Defendants' material

misrepresentations and omissions in the 2024 Proxy.

115.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

### COUNT II
#### Against the Individual Defendants
#### For Breach of Fiduciary Duty

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

119.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed

to disclose, *inter alia*, that: (a) IIP was experiencing significant declines in rent payments and property management fees in connection with certain customer leases; (b) the decline in rent payments and property management fees would likely impair the Company's ability to maintain FFO and revenue growth; (c) as a result, IIP's leasing operations were less profitable than the Company had represented to investors; (d) the Board and management were not properly overseeing risks to the Company, namely risks related to rental payments; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

121.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

122.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

123.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

124.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

125.    Plaintiff, on behalf of IIP, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

128.    Plaintiff on behalf of IIP has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, IIP.

131.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from IIP that was tied to the

performance or artificially inflated valuation of IIP, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

132.    Plaintiff, as a shareholder and a representative of IIP, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

133.    Plaintiff on behalf of IIP has no adequate remedy at law.

<u>COUNT V</u>
**Against the Individual Defendants for Waste of Corporate Assets**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

136.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

137.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

138.    Plaintiff, on behalf IIP, has no adequate remedy at law.

<u>COUNT VI</u>
**Against Defendants Gold, Smithers, Smith, and Regin for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

139.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

140.    IIP and Defendants Gold, Smithers, Smith, and Regin are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Gold's, Smithers', Smith's, and Regin's willful and/or reckless violations of their obligations as officers and/or directors of IIP.

141.    Defendants Gold, Smithers, Smith, and Regin, because of their positions of control and authority as officers and/or directors of IIP, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of IIP, including the wrongful acts complained of herein and in the Securities Class Action.

142.    Accordingly, Defendants Gold, Smithers, Smith, and Regin are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

143.    As such, IIP is entitled to receive all appropriate contribution or indemnification from Defendants Gold, Smithers, Smith, and Regin.

144.    Plaintiff, on behalf IIP, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

     B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

     C.     Awarding punitive damages;

     D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: February 12, 2025        **LEVI & KORSINSKY, LLP**

               By:  */s/ Jordan A. Cafritz*
                   Jordan A. Cafritz (Bar #:20908)
                   Donald J. Enright (Bar #:13551)
                   1101 Vermont Ave NW, Suite 800
                   Washington, D.C. 20005
                   Telephone: (202) 524-4290
                   Email: jcafritz@zlk.com
                       denright@zlk.com

                   *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
Leah B. Wihtelin

825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
        tjm@rl-legal.com
        vl@rl-legal.com
        lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com